UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 16 CR 462-12 |
| v. | Judge Rebecca R. Pallmeyer |
| JOSE PENA, a/k/a "Dre" | |

## **PLEA AGREEMENT**

1.     This Plea Agreement between the United States Attorney for the Northern District of Illinois, JOHN R. LAUSCH, JR., and defendant JOSE PENA, and his attorney, JAMES TUNICK, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(A), as more fully set forth below. The parties to this Agreement have agreed upon the following:

### **Charges in This Case**

2.     The indictment in this case charges defendant with participating in a racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d) (Count One); conspiring to commit murder, in aid of racketeering, in violation of Title 18, United States Code, Section 1959(a)(5) (Counts Two and Six), committing attempted murder, in aid of racketeering, in violation of Title 18, United States Code, Section 1959(a)(5) (Count Three), committing assault with a dangerous weapon, in aid of racketeering, in violation of Title 18, United States Code, Section 1959(a)(3) (Count Four); and using, carrying, brandishing, and discharging a firearm during and in relation to a crime of violence, namely a violation of Title 18, United States Code,

Section 1959(a), in violation of Title 18, United States Code, Section 924(c)(1)(A) (Count Five).

3.    Defendant has read the charges against him contained in the indictment and those charges have been fully explained to him by his attorney.

4.    Defendant fully understands the nature and elements of the crimes with which he has been charged.

## Charges to Which Defendant Is Pleading Guilty

5.    By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the following counts of the indictment: Count One, which charges defendant with racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d), and Count Five, which charges defendant with using, carrying, brandishing, and discharging a firearm during and in relation to a crime of violence, namely, a violation of Title 18, United States Code, Section 1959(a), in violation of Title 18, United States Code, Section 924(c)(1)(A).

## Factual Basis

6.    Defendant will plead guilty because he is in fact guilty of the charges contained in Counts One and Five of the indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt and constitute relevant conduct pursuant to Guideline § 1B1.3:

## Count One

With regard to Count One, beginning no later than in or about March 2014, and continuing to in or about September 2015, in the Northern District of Illinois, Eastern Division and elsewhere, defendant JOSE PENA, along with his co-defendants, together with others, being persons employed by and associated with the Latin Kings street gang, knowingly conspired to conduct and participate in the conduct of the affairs of the Latin Kings street gang through a pattern of racketeering activity as described in Count One of the indictment; that the Latin King street gang was an enterprise, as defined in Title 18, United States Code, Section 1961(4); that PENA agreed that a co-conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Latin Kings street gang; and that the Latin Kings street gang was engaged in, and its activities affected, interstate commerce; all in violation of Title 18, United States Code, Section 1962(d).

Specifically, PENA joined the Latin Kings street gang in approximately March 2014, after receiving a one-minute beating by other Latin Kings as part of his initiation into the gang (also referred to as a "violation"), and was a member through approximately September 2015.

During his period of membership in the Latin Kings, PENA learned that the Latin Kings were divided into different "regions" with members located in the Chicago area and elsewhere. Those "regions" were further divided into "sections." PENA was a member of the Maywood section of the Latin Kings within the Midwest

region. The geographical location controlled by the Maywood section included the area east of 25th Avenue, west of 1st Avenue, north of Lake Street, and south of North Avenue, in Maywood and Melrose Park, Illinois.

Based upon his membership in the gang, PENA also knew that, at various times, the Maywood section was divided into two groups or "circles": a group of older members, sometimes referred to as the "Junior" or older circle; and a group of younger members, sometimes referred to as the "Pee-Wee" or younger circle. The Maywood section of the Latin Kings, and each circle within the section, maintained a leadership structure that included the following leadership or ranking positions: the leader, or "Inca"; the second-in-command, or "Cacique"; the "Chief Enforcer" and "Enforcer," who served to support the Inca and Cacique, as well as enforce discipline and adherence to established rules and laws; and "Treasurer," who was responsible for the gang's finances.

As a Maywood Latin King, PENA attended numerous gang meetings during which gang business was discussed and violations were administered to members. As a Maywood Latin King, PENA was also required to pay approximately $10 to $20 in weekly dues to the Treasurer. Those dues were collected and used to pay for bond and lawyers for arrested gang members. Dues were also used to pay for guns.

PENA also participated in conducting "security" in the neighborhood, which involved flashing gang signs, protecting the territory, and shooting on sight rival gang members and "runaways" (former members of the gang who were no longer in good

4

standing) who entered that territory, or if no gun was available "bricking" (throwing a brick or a bottle) or beating them. For example, during PENA's membership in the gang, there was a standing order to shoot on sight ("SOS") any rival Imperial Gangsters, Gangster Disciples, Vice Lords, and Four Corner Hustler gang members and any gang member who wasn't a Latin King.

PENA was also required to participate in "hood out" days. During hood out days, which usually occurred on Friday and Saturday nights, participation in security was mandatory. The purpose of hood out days was to keep rival gang members out of the Latin Kings' territory and show their own presence in the neighborhood. As part of representing the gang and showing its presence, members also frequently wore the gang's colors of black and gold. In order to identify himself as a Latin King and check whether other individuals were also Latin Kings, PENA and other Latin Kings sometimes used various phrases or words including reciting the "five" (love, honor, obedience, sacrifice, and righteousness) and the "three" (knowledge, wisdom, and understanding), which the other person had to say in order. As a Maywood Latin King, PENA was also aware of various guns used by the gang to conduct security and carry out shootings that were referred to as "hood" guns or "Nation" guns.

Beginning in July 2014 and ending in approximately August 2014, PENA held the position of Enforcer. As the Enforcer, PENA made sure that other members participated in hood out days, assigned members different roles during security, made sure that guns were loaded, made sure that members had the guns they were

supposed to have, and was responsible for enforcing discipline. Through his membership, PENA became aware that the Latin Kings operated under a series of laws and policies, some of which were codified in a "manifesto" or "constitution." To enforce discipline and the rules of the enterprise, the Latin Kings engaged in a system of violations, in which members physically beat other members who violated rules or questioned authority. Among the rules, Latin King members were required to pay dues, attend gang meetings, abide by orders, participate in "burners," "hits," and "missions" (involving shootings), and conduct security.

Both as an Enforcer and as a soldier within the gang, PENA personally participated in the administration of multiple violations, or physical beatings of other gang members who violated rules or questioned authority.

As part of his participation in the Latin Kings, PENA also directly participated in and/or agreed to the commission of multiple violent acts involving attempted murder, conspiracy to commit murder, aggravated assault, and extortion, some of which are described below.

### May 11, 2014 Attempted Murder of Victim 1

On or about May 11, 2014, in Melrose Park, PENA, along with other Latin Kings, attempted to murder Victim 1, a runaway former member of the Latin Kings. On or about the night of May 10, 2014, PENA and other Maywood Latin Kings were drinking at a bar in Melrose Park, Illinois. After some Maywood Latin Kings went

looking for Victim 1 because he was a runaway, Victim 1 shot at them. As a result, that night, Maywood Latin Kings leadership issued an order to shoot Victim 1.

The next day, on or about May 11, 2014, other Maywood Latin Kings notified PENA that Victim 1 was at a particular restaurant in Melrose Park, Illinois. PENA and other Maywood Latin Kings went to the restaurant to carry out the order to shoot Victim 1. After Victim 1 left the restaurant, PENA shot Victim 1 multiple times. PENA acknowledges that Victim 1 suffered multiple gunshot wounds to his stomach and chest, and despite multiple surgeries, suffered permanent colon damage. PENA shot and attempted to murder Victim 1 because Victim 1 was a runaway from the Maywood Latin Kings and because the Maywood Latin Kings had an interest in ensuring that members remained loyal to, and did not leave, the gang. Following the shooting, PENA hid in a nearby tire shop

### July 5 and 6, 2014, Conspiracy to Commit Murder of Rival Gang Members

Between on or about July 5, 2014, and July 6, 2014, in Melrose Park and elsewhere, PENA and other Maywood Latin Kings conspired to murder members of the Imperial Gangsters ("IGs"), a rival street gang. On July 5, 2014, PENA and other Maywood Latin Kings met in Melrose Park and made plans to commit a shooting at a particular house associated with members of the IGs. The shooting was rescheduled for the next day because of increased police presence in the area.

On July 6, 2014, PENA attended a Maywood Latin Kings meeting in Melrose Park. At the meeting, PENA was elected to the Enforcer position within the younger

circle. Following the meeting, PENA and other Maywood Latin Kings saw a person they believed to be a rival gang member and chased that person.

### July 11, 2014, Aggravated Assault

On or about July 11, 2014, through his position as Enforcer, PENA ordered other Maywood Latin Kings to assist him in beating another individual, Victim 3, at a particular liquor store in Maywood, Illinois. Specifically, PENA other Maywood Latin Kings to beat up Victim 3 because Victim 3 had previously threatened PENA with a knife. PENA and other Maywood Latin Kings waited outside the liquor store for Victim 3 and when they saw Victim 3, they punched, kicked, and beat Victim 3 with a baseball bat while yelling "King Love" and displaying Latin King gang signs.

### Extortion of Drug Dealers in Maywood Latin King Territory

In approximately 2014, Maywood Latin Kings leadership instructed PENA and other members of the younger circle to demand and take a portion (also referred to as a "tax") of the profits from drug dealers who were not members of the Maywood Latin Kings but were selling drugs in the gang's territory. PENA and other Latin Kings were ordered to tax anyone they saw or knew selling drugs in Maywood territory.

### Count Five

With regard to Count Five, on or about May 11, 2014, at Melrose Park, in the Northern District of Illinois, Eastern Division, defendant JOSE PENA, along with certain of his co-defendants did use, carry, brandish, and discharge a firearm, during

and in relation to a crime of violence for which they each may be prosecuted in a court of the United States, namely, a violation of Title 18, United States Code, Section 1959(a), in violation of Title 18, United States Code, Sections 924(c)(1)(A) and 2.

Specifically, on or about May 11, 2014, in Melrose Park, PENA attempted to murder Victim 1, a runaway former member of the Latin Kings, by discharging a firearm. On or about the night of May 10, 2014, members of the Maywood section of the Latin Kings got into an altercation with Victim 1. Following the altercation, Maywood Latin King leadership issued an order to shoot Victim 1 (or beat Victim 1 if he could not be shot). On or about May 11, 2014, Victim 1 was located at a particular restaurant in Melrose Park and PENA, along with other Latin Kings, were called to confront Victim 1. PENA and other Maywood Latin Kings went to the restaurant and waited for Victim 1 to exit, upon which PENA discharged a .45 caliber pistol multiple times at Victim 1 and attempted to murder Victim 1. PENA attempted to murder Victim 1 because Victim 1 was a runaway from the Maywood Latin Kings and because the Maywood Latin Kings had an interest in ensuring that members remained loyal to, and did not leave, the gang.

## Maximum Statutory Penalties

7. Defendant understands that the charges to which he is pleading guilty carry the following statutory penalties:

a. Count One carries a maximum sentence of life imprisonment. Pursuant to Title 18, United States Code, Section 3561, defendant may not be

sentenced to a term of probation on this count. Count One also carries a maximum fine of $250,000. Defendant further understands that with respect to Count One the judge also may impose a term of supervised release of not more than five years.

b. Count Five carries a maximum sentence of life imprisonment, and a statutory mandatory minimum sentence of 10 years. The sentence of imprisonment on Count Five is required to be consecutive to any other sentence imposed. Pursuant to Title 18, United States Code, Section 3561, defendant may not be sentenced to a term of probation on this count. Count Five also carries a maximum fine of $250,000. Defendant further understands that with respect to Count Five, the judge also may impose a term of supervised release of not more than five years.

c. Defendant further understands that the Court must order restitution to the victims of the offense in an amount determined by the Court unless it determines that restitution is not applicable because the number of identifiable victims is so large as to make restitution impracticable or determining complex issues of fact related to the cause or amount of the victim losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

d. In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on each count to which he has pled guilty, in addition to any other penalty or restitution imposed.

e.   Therefore, under the counts to which defendant is pleading guilty, the total maximum sentence is life imprisonment, and the minimum sentence is 10 years' imprisonment. In addition, defendant is subject to a total maximum fine of $500,000, a period of supervised release, and special assessments totaling $200, in addition to any restitution ordered by the Court.

## Sentencing Guidelines Calculations

8.   Defendant understands that in determining a sentence, the Court is obligated to calculate the applicable Sentencing Guidelines range, and to consider that range, possible departures under the Sentencing Guidelines, and other sentencing factors under 18 U.S.C. § 3553(a), which include: (i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (iii) the kinds of sentences available; (iv) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (v) the need to provide restitution to any victim of the offense.

9.   For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

11

a. **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2016 Guidelines Manual.

b. **Offense Level Calculations**.

i. <u>**Count One (Racketeering Conspiracy)**</u>

1. Pursuant to Guideline § 2E1.1 (and application note 1), each underlying offense comprising the racketeering activity is treated as a separate count of conviction and the offense level for these counts are to be determined only after applying all of the Chapter Three enhancements and reductions.

2. <u>RICO Act One (May 11, 2014, Attempted Murder of Victim 1)</u>

a. The base offense level for RICO Act One is 33, pursuant to Guideline §§ 2E1.1(a)(2) and 2A2.1(a)(1) because the object of the offense would have constituted first degree murder.

b. The offense level for RICO Act One is increased 4 levels, pursuant to § 2A2.1(b)(1)(A), because Victim 1 sustained permanent or life-threatening bodily injury.

c.      Therefore, the adjusted offense level for RICO Act One is 37.

3.      RICO Act Two (Conspiracy to Commit Murder on July 5-6, 2014)

a.      The base offense level for RICO Act Two is 33, pursuant to Guideline §§ 2E1.1(a)(2) and 2A1.5(a). The government currently does not anticipate any additional enhancements under this Guideline for specific offense characteristics. Therefore, the adjusted offense level for RICO Act Two is 33.

4.      RICO Act Three (Aggravated Assault)

a.      The base offense level for RICO Act Three is 14, pursuant to Guideline §§ 2E1.1(a)(2) and 2A2.2(a).

b.      The offense level for RICO Act Three is increased by 4 levels, pursuant to Guideline § 2A2.2(b)(2)(B), because a dangerous weapon was otherwise used.

c.      The offense level for RICO Act Three is increased by 4 levels, pursuant to Guideline § 2A2.2(b)(3)(D), because the degree of injury suffered by Victim 3 was between bodily injury and serious bodily injury.

d.      The offense level for RICO Act Three is increased 3 levels, pursuant to Guideline § 3B1.1(b), because the defendant was a manager or supervisor of a criminal activity that involved five or more participants or was otherwise extensive.

e. Therefore, the adjusted offense level for RICO Act Three is 25.

5. <u>RICO Act Four (Extortion)</u>

a. The base offense level for RICO Act Four is 18, pursuant to Guideline §§ 2E1.1(a)(2) and 2B3.2(a). The government currently does not anticipate any additional enhancements under this Guideline for specific offense characteristics. Therefore, the adjusted offense level for RICO Act Four is 18.

6. <u>RICO Act Five (Conspiracy to Commit Murder)</u>

a. The base offense level for RICO Act Five is 33, pursuant to Guideline §§ 2E1.1(a)(2) and 2A1.5.

b. It is the government's position that the offense level for RICO Act Five is increased by 3 levels, pursuant to Guideline § 3B1.1(b), because the defendant was a manager or supervisor of a criminal activity that involved five or more participants or was otherwise extensive. Defendant reserves the right to argue that he should not receive an increase in offense level under Guideline § 3B1.1(b). Each party is free to present evidence and argument to the Court on this issue.

c. Therefore, the government's position is that the adjusted offense level for RICO Act Five is 36.

7. <u>Grouping of Racketeering Acts:</u>

a. Pursuant to Guideline § 3D1.2(d), the offenses of attempted murder, conspiracy to commit murder, aggravated assault, and extortion are not grouped, and, instead, are treated as separate groups as they involve separate victims and separate harm.

b. Pursuant to Guideline § 3D1.4, the combined offense level is determined by starting with the Group with the highest offense level.

c. The highest offense level for the racketeering acts identified above is 37 for RICO Act One, which counts as one unit pursuant to Guideline § 3D1.4(a).

d. One additional unit is added each of RICO Acts Two and Five because the total offense level for these Groups are each between 1 and 4 levels less serious than the Group for RICO Act One.

e. Pursuant to Guideline § 3D1.4(c), because the Groups for RICO Acts Three and Four are 9 or more levels less serious than the Group for RICO Act One, these groups are disregarded and no additional levels are added.

f. Because the total number of units equals 3, the offense level applicable to the group for RICO Act One is increased by 3 levels, resulting in a total offense level of 40 for Count One.

## ii. **Count Five (Discharge of a Firearm During and In Relation to a Crime of Violence)**

1.      The Guideline applicable to the offense is Guideline § 2K2.4.

2.      Pursuant to Title 18, United States Code, Section 924(c) and Guideline § 2K2.4(b), the guideline sentence for Count Five is ten years' imprisonment, to be served consecutive to any sentenced imposed on Count One.

iii.      Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine or restitution that may be imposed in this case, a two-level reduction in the offense level is appropriate.

iv.      In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

c.    **Criminal History Category**. With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government, defendant's criminal history points equal zero and defendant's criminal history category is I.

d.    **Anticipated Advisory Sentencing Guidelines Range**. Therefore, based on the facts now known to the government, the anticipated offense level is 37, which, when combined with the anticipated criminal history category of I, results in an anticipated advisory sentencing guidelines range of 210 to 262 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose. Defendant also acknowledges that he is subject to a statutory minimum sentence of 10 years' imprisonment, which sentence must be consecutive to any other term of imprisonment imposed on the defendant.

e.    Defendant and his attorney and the government acknowledge that the above guidelines calculations are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional guidelines provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation

officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

        f.      Both parties expressly acknowledge that this Agreement is not governed by Fed. R. Crim. P. 11(c)(1)(B), and that errors in applying or interpreting any of the sentencing guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the guidelines. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Agreement, on the basis of such corrections.

## Agreements Relating to Sentencing

        10.    Each party is free to recommend whatever sentence it deems appropriate.

        11.    It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea.

        12.    Restitution shall be due immediately, and paid pursuant to a schedule to be set by the Court at sentencing. Defendant acknowledges that pursuant to Title

18, United States Code, Section 3664(k), he is required to notify the Court and the United States Attorney's Office of any material change in economic circumstances that might affect his ability to pay restitution.

13.    Defendant agrees to pay the special assessment of $200 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

14.    Defendant agrees that the United States may enforce collection of any fine or restitution imposed in this case pursuant to Title 18, United States Code, Sections 3572, 3613, and 3664(m), notwithstanding any payment schedule set by the Court.

15.    After sentence has been imposed on the counts to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the indictment, as well as the forfeiture allegation as to defendant.

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

16.    This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 16 CR 462-12.

17.    This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial

civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

### Waiver of Rights

18.     Defendant understands that by pleading guilty he surrenders certain rights, including the following:

a.      **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

i.      The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii.     If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii.  If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt and that it was to consider each count of the indictment separately. The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

iv.  If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

v.  At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

vi.  At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

vii.  At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be

drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

        b.    **Waiver of appellate rights**. Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial, and may only appeal the validity of this plea of guilty and the sentence imposed. Defendant understands that any appeal must be filed within 14 calendar days of the entry of the judgment of conviction.

        19.    Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs, with the exception of the appellate rights specifically preserved above. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

### Presentence Investigation Report/Post-Sentence Supervision

        20.    Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope, and extent of defendant's conduct regarding the charges against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing.

        21.    Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's

Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

22.    For the purpose of monitoring defendant's compliance with his obligations to pay a fine and restitution during any term of supervised release to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Other Terms

23.    Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine and restitution for which defendant is liable, including

providing financial statements and supporting records as requested by the United States Attorney's Office.

24. Defendant understands that, if convicted, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

## Conclusion

25. Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

26. Defendant understands that his compliance with each part of this Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of

limitations between the signing of this Agreement and the commencement of such prosecutions.

27. Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

28. Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

29. Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: _____8/14/18_____

_John R. Lausch Jr./by/mh_
JOHN R. LAUSCH, JR.
United States Attorney

_Matthew Hernandez_
MATTHEW HERNANDEZ
Assistant U.S. Attorney

_____
JOSE PENA
Defendant

_____
JAMES TUNICK
Attorney for Defendant