UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 16 CR 462-12 |
| v. ) | |
| ) | Hon. Rebecca R. Pallmeyer |
| JOSE PENA a/k/a "Dre" ) | |

### GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM

On Mother's Day, May 11, 2014, in broad daylight, the defendant and three of his co-defendants waited outside for a "runaway" former gang member, Victim 1. Between couples with small children, everyday citizens attempting to go about their business, they waited to carry out their order to "shoot on sight" Victim 1. The fact that it was Mother's Day did not matter. Nor did the fact that there were children running about. The defendant's role, as a member of the younger circle was to wait across the street with a loaded .45 caliber pistol for Victim 1 to emerge. When Victim 1 finally did emerge, the defendant carried out that order and shot Victim 1 multiple times—causing Victim 1 to undergo surgeries and require a colostomy bag for the rest of his life. The defendant's age at the time of the shooting does not excuse his decision to attempt to murder another person. The fact that the defendant states that he became a "runaway" Latin King (more than one year after he pulled that trigger multiple times), does not explain why he attempted to murder Victim 1 based upon Victim 1's attempt to disassociate himself. Nor can the defendant's conduct be explained by a diagnosis of ADHD or the admittedly good upbringing he experienced.

As such, the government requests that the Court impose a sentence that includes a term of imprisonment within the defendant's guideline range.

## I. Guidelines Calculation

The government agrees with the PSR's calculation of a total offense level of 37, which, when combined with the anticipated criminal history category of I, results in an anticipated guideline range of 210 to 262 months' imprisonment as to Count One, as well as a mandatory consecutive 120 months pursuant to Count Five. *See* PSR ¶ 117.

## II. Sentencing Recommendation

### A. A Guideline Sentence Is Sufficient, But Not Greater Than Necessary

Through his participation in the Latin Kings, the defendant directly contributed to the violence that permeates the Chicago area and caused devastating harm to countless individuals. The sentence imposed must reflect both the gravity of the defendant's conduct and the magnitude of harm he caused. Finally, the sentence imposed must provide just punishment and adequate deterrence (both specific and general). A sentence within the defendant's guideline range is sufficient, but not greater than necessary, to comply with the principles set forth in 18 U.S.C. § 3553(a).

1. **The Nature and Circumstances of the Offense Warrant a Guidelines Sentence**[1]

Pursuant to 18 U.S.C. § 3553(a)(1), the Court must consider "the nature and circumstances of the offense." That said, it is impossible to overstate the serious nature and circumstances of the defendant's offense.

a. **Latin Kings**

The Latin Kings are a highly organized and hierarchical criminal enterprise, with its own constitution, manifesto, and code of conduct, as well as its own colors, handshake, salute, emblems, signs, flag, and territories. Territories were divided into "regions," which were further divided into "sections" (sometimes called "chapters"). The highest-ranking member of a section is the "Inca," and the second highest-ranking member is the "Cacique." Below the "Cacique" is the "Chief Enforcer" and the "Enforcer."

There were several regions of the Latin Kings operating in Chicago and the suburbs of Chicago. One such region was the "Midwest" region. Included within the Midwest region was the Maywood section of the Latin Kings, which the defendant joined sometime in approximately March 2014. PSR ¶ 9. For a period of at least one month, the defendant held the Enforcer position for the younger circle of gang members. *Id*. As Enforcer, the defendant supervised non-ranking and lower-ranking members to commit racketeering acts for that period of time.

---

[1] The Government's Version contains additional facts regarding the nature and circumstances of the offense.

3

### b. Rules and Practices

The Latin Kings had a rigid set of rules and practices, which were contained in the gang's written "manifesto" or "constitution" as well as the Maywood section's local rules. In his role as Enforcer, the defendant ensured adherence to these established rules and practices and enforced discipline for disobedience.

### c. Security and Firearms

One of the gang's most important rules required members to protect themselves, other Latin King members, and the gang's territory from its rivals, often through violence. One of the ways the Latin Kings protected their territory was by conducting mandatory "security," which was sometimes referred to as "posting-up." That meant that members patrolled their territory, armed with guns, and were required to shoot to kill any trespassing member of a rival gang, any former member of the Latin Kings not in good standing, and any other individual that posed a threat. Members were required to carry guns when they patrolled in their own territory and also when they traveled to rival territory. As Enforcer, the defendant was responsible for coordinating security (telling members when and where to show up) and directing where the firearms used on security were to be located. *See* Exhibit C to Government's Version; Plea Agreement (Dkt. 531 at 5-6).

### d. Shoot on Sight Orders and Violations

Another method the gang used to protect themselves and their power was issuing standing orders to shoot (also known as "SOS" orders) and beat rival gang members and former Latin King members, also known as "runaways," and by ordering "burns," "hits," and "missions," which were one-time orders to shoot and beat

4

specific rival gang members and runaways. The gang's rules also required violence against fellow Latin King members. For example, new recruits were initiated into membership through violent beatings. In addition, the rules provided for mandatory beatings or "violations" for any member who broke the rules or failed to follow orders. The message was clear: disobedience would not be tolerated. What these rules and practices make clear is that violence, shootings, and death were a day-to-day part of the Latin King lifestyle. As demonstrated in his Facebook posts, the defendant thoroughly embraced the gang lifestyle and all of its violence. *See* Exhibits D and E to Government's Version; PSR at ¶ 98 (tattoos).

      e.    **As a Maywood Latin King, the Defendant Conspired to Murder Rival Gang Members, as Well as Committed Extortion**

As a Maywood Latin King, the defendant further agreed to specific plans to commit shootings and discussed prior shootings that he personally committed. As detailed in pages 6-7 of the plea agreement, Paragraphs 25-31 of the PSR, and above, the defendant participated in the attempted murder of Victim in May 2014 and was responsible for pulling the trigger.

As detailed in Paragraphs 32-39 of the PSR, between July 5 and 6, 2014, the defendant and others conspired to carry out several "hits" or shootings at rival gang members. On July 5, 2014, the defendant and multiple co-conspirators planned to commit a shooting at a particular house associated with members of the IGs.[2] The

---

[2]     The gang would commit the arson of the IG's vehicle at this location approximately one week later.

shooting was called off and rescheduled for the next day (July 6) after law enforcement saturated the area.

That next day, July 6, 2014, the defendant attended a gang meeting where he was voted into the Enforcer position and various members were ordered to do three shootings that night. *See* Exhibit B to Government's Version at 2. Following the meeting, the defendant left with other gang members when they encountered an individual they thought might be a rival gang member. *Id.*; PSR at ¶ 13; Exhibit A to Government's Version at 3. The defendant and several of his co-defendants retrieved a gun and displayed gang signs at the individual. Exhibit A to Government's Version at 3. When FBI agents intervened, one of the defendant's co-defendants, Edgar Velarde-Saldana, a/k/a "Chapo," fired multiple shots at law enforcement officers.

The defendant and other Latin Kings also engaged in acts of extortion, including by collecting "street tax" from non-gang members who distributed controlled substances, including cocaine, within the geographical location controlled by the enterprise, as well as local businesses. *See* PSR at ¶ 15.

### 2. Defendant's History and Characteristics

Pursuant to 18 U.S.C. § 3553(a)(1), the Court must also consider "the history and characteristics of the defendant." As with many defendants, the defendant's history and characteristics present both factors in aggravation and mitigation. The defendant pled guilty pursuant to a plea agreement. He also has little criminal history and his age at the time of the offense should also be taken into account. Although the defendant held rank within the gang, he apparently did so for only a short period of time. A sentence within the defendant's guideline range takes into

account the defendant's history and characteristics, including the defendant's leadership role.

### 3. A Guidelines Sentence is Appropriate Upon Consideration of Section 3553(a)(2)

Pursuant to 18 U.S.C. § 3553(a)(2), the Court must consider the need for the sentence imposed:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

A sentence within the defendant's guidelines range adequately reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense. Among the offenses brought before the Court, the defendant's is among the most serious, especially in this community. There is a significant need for the sentence imposed to promote respect for the law and provide just punishment.

Moreover, in a community absolutely shaken by senseless gun violence, particularly that involving individuals using social media to incite violence and instill fear (like this defendant), there must be consequences. While the criminal justice system can only address so many of the ills that cause the violence plaguing this community, it plays an important role when those responsible for perpetrating the destruction stand before the Court. Many innocent members of society live in constant fear. They do not let their children play outside, they do not go out after dark. They usher their children along what they can only pray are "safe passages" to

7

school. There must be a deterrent message sent to those, like this defendant, who contribute to this environment of fear. A guideline sentence would adequately takes into account these considerations of deterrence, promoting respect for the law, and providing just punishment.

### B. Supervised Release

The government recommends a sentence that includes a term of two years' supervised release that includes the terms and conditions recommended in the PSR.[3]

### III. CONCLUSION

For all of the aforementioned reasons, the Court should sentence the defendant to a term of imprisonment within the defendant's guideline range.

            Respectfully submitted,

            JOHN R. LAUSCH, JR.
            United States Attorney

By:   s/ *Matthew Hernandez*
       MATTHEW HERNANDEZ
       Assistant U.S. Attorney
       219 South Dearborn, Fifth Floor
       Chicago, Illinois 60604
       (312) 353-5300

Dated: February 19, 2019

---

[3] Pursuant to Paragraphs 112-114, it appears as though the defendant does not have the ability to pay a fine and therefore the government does not request that one be imposed.